SAMUEL DUFFIELD *vs.* JOHN LEWDEN ROBESON, executor of
Doct. JOHN L. MORRIS.

The presumption of law is in favor of *sanity.*

If general insanity be proved, the presumption is that it continues.

A lunatic may make a will in a lucid interval, but this must be proved.

Stronger proof of lucidity necessary in cases of general insanity than in those of an
occasional or temporary character.

Insanity from intemperance is generally of a temporary kind, and followed not merely
by a lucid interval but by a permanent restoration to reason.

To such a case the presumption of insanity would not apply.

*Sound disposing* mind and memory—what ?   *Unsound* mind—what ?

The law makes no presumption of *insanity* from the act of *suicide,* but it is a fact for
the jury ; and in some cases would be strong proof of insanity.

What degree of *influence* will vitiate a will?

Not merely importunity, but coercion destroying free agency.

Rebutted by proof of instructions, capacity, design, previous intention, freedom from
restraint, &c.

ISSUE from the register for the probate of wills, and granting letters
of administration in and for New Castle county, to try the question,

" whether the paper writing purporting to be the last will and testament of John L. Morris, deceased, is or is not the last will and testament of the said John L. Morris, deceased."

Trial before Harrington and Layton, justices, and a special jury. The chief justice did not sit, having been of counsel. (And he did not sit again this term, on account of indisposition.)

The executor propounded the will, and proved the *factum.*

The will bore date 8th November, 1836. By it the testator devised one-half his real estate, or its proceeds, to his sister, Mrs. Duffield, and the other half to his cousin John Lewden Robeson, in fee; and all his personal property, (except specific legacies,) and an annuity of $200, for five years, out of his land to his aunt, Elizabeth L. Kean. He directed the immediate payment of all his debts, and authorized the executors to sell his real estate. He also directed that his body should be buried in an erect posture, at a particular place on a rising ground in one of his fields, with his face looking to the south; and he desired that no external marks of mourning for his death should be worn by any of his relatives, and that but few persons, to be selected by his executors in and about Newport, should attend his interment.

The subscribing witnesses testified strongly to the sanity of Doctor Morris. They had never heard a doubt expressed with regard to the soundness of his mind until after his death. He had been intemperate whilst living at Newport, but had recently removed to Wilmington; lived in J. L. Robeson's family, and had reformed. J. L. Robeson was the cousin of Doctor Morris, and Robeson's father was Morris's guardian. Mrs. Kean was his aunt, and raised him. Mrs. Duffield was an only sister, and resided out of this state. Doctor Morris had a strong affection for all of these relatives.

On the 7th November, 1836, Doct. Morris came to Mr. Thompson's store in company with J. L. Robeson, and executed a will. It was in Robeson's hand-writing. On this account, and because of some informality in the draft, Mr. Thompson advised Doct. Morris to take it to a scrivener and have it put in better form. He did so. Robeson was not present, either at the execution, or when this advice was given. About 11 o'clock, A. M., of the 8th, Doct. Morris again returned with the will copied by a scrivener; said he had got it all right now, and executed it in due form. The next morning he committed suicide in the most deliberate manner. The will was found in his bureau with directions not to be opened until Doctor Duffield arrived. There was also a memorandum in his own handwriting, without date, referring to his " expected dissolution," and giving certain directions.

The will was oppposed on the ground of insanity and weakness of mind, arising from habits of intemperance ; and also, on the ground of improper influence exercised over the testator by some of the devisees.

A great many witnesses for the caveator proved acts of extravagant and unreasonable conduct on the part of Doctor Morris at sundry times; excessive intemperance, irritability, habits of seclusion from society, anxiety of mind, melancholy and great despondency of spirits. These were occasional and not uniform; but they were so frequent or so violent that many of the witnesses believed him to be " out of his right mind" for several years before his death; others, that he was absolutely insane.

On the other hand, many witnesses of equal respectability, who had been in constant habits of intimacy with Doct. Morris up to the day of his death, had never suspected or heard it intimated that he was not of sound mind; and testified moreover to a considerable degree of shrewdness and intelligence in the management of his affairs. He was for several years intemperate, and lived in a secluded manner at his farm near Newport; and shunned his early associates from a consciousness of his own degradation. He had reformed a few months before his death, and removed to Wilmington, at the solicitation of his friends there, and lived with J. Lewden Robeson, who was his cousin, and whom he regarded as a younger brother, having himself been raised by Robeson's father, and by his aunt, Mrs. Kean, who was Robeson's mother. His attachment to his sister, Mrs. Duffield, was also strong, and to her husband, Doctor Duffield.

*Booth* and *W. H. Rogers*, in argument before the jury in behalf of the caveator contended—

1. That suicide was prima facie evidence of insanity ; and a reasonable ground from which to infer insanity.

2. That the will itself contained strong internal evidence of insanity.

3. That actual insanity at times had been proved, from which the law would infer its continuance, and throw the burden of proof on the other side, of a lucid interval.

4. That the purpose of suicide fixed in the testator's mind at the time of making his will, was evidence of such a state of unsoundness of mind as should vitiate the will.

5. That, at the least, Dr. Morris' mind was proved to have been much weakened and impaired by intemperance, rendering him liable to improper influences; and that there were circumstances of suspi-

cion which ought to throw it upon the other side to show conclusive evidence of instructions, understanding and design, in making the will.

They cited *Rush on the Mind*, 31 ; *Beck's Med. Jurisprudence*, 153 375 ; *Abercrombie*, 257-8 ; *Shelford on Lunacy*, xxxviii, xlvi, 274, 175 ; 2 *Stark. Ev.* 930 ; *Cooper's Med. Juris.* 395 ; 1 *Ecc. Rep.* 70, 72, 273 ; 3 *ib.* 172 ; 5 *ib.* 342.

*J. A. Bayard*, for the defendant, contended—

1. That general sanity was to be presumed.

2. That though this general presumption may be rebutted, and thrown on the other side by proof of general *insanity*, yet in case of temporary or partial insanity produced by intemperance, the legal presumption of sanity is not rebutted, nor proof of a lucid interval necessary.

3. That insanity is not to be presumed from the act of *suicide*.

4. That intemperance leads to mania a potu and death ; seldom, if ever, produces settled insanity.

5. That the will was rational in itself, and consistent with the testator's natural affections.

6. That there was proof of capacity, deliberation, instructions and design in making the will ; and

7. That there was no evidence of undue influence.

He cited 4 *Blac. Com.* 189 ; *Hawk. P. C.* 132 ; 1 *Hagg. Ecc. Rep.* 109, 291, 273, 211 ; 3 *ib.* 370 ; 5 *ib.* ; 1 *Dow's Par. Rep.* 148.

*By the Court.*

Harrington, *Justice*, charged the jury—

That the factum or formal execution of the will was proved, so as to throw it on the caveator to show that it was not the will of Doctor Morris, either by establishing that at the time of making it, he had not sufficient mind and judgment, or such a disposing memory as would enable him to make a will ; or that having such a capacity, it was restrained and controlled by another's influence over him.

That the question was one of very considerable importance to the parties ; and, from its nature, such as is always attended with difficulty in deciding upon. It involved a discussion as to mental qualities, a subject sufficiently abstruse in itself ; and, in addition, it involved an inquiry into the strength and operations of an individual mind, on evidence furnished through the uncertain medium of other minds, with the coloring and impress which the peculiar structure of each one gives to the facts which it details.

Neither was it a subject upon which the court could afford much assistance to the jury. It does not admit of generalizing. Though much has been said and written about it with a view to point out the

marks of insanity; to explain what is meant by a sound disposing mind on the one hand, or an unsound mind on the other, the judgment is at last to be formed on the facts and circumstances of each particular case. For, as insanity is the aberration of reason, no man can undertake to point out the path of the benighted wanderer; or to pronounce with certainty when the light of reason is extinguished. General rules may doubtless be laid down in reference to decided cases of insanity, of glaring, raging madness; but these are not the cases usually presented on trying the validity of wills, where juries have to perform the more difficult task of marking the borders between reason and insanity; the extreme point where mind and memory surrender their government of the individual to fatuity and delusion.

Reason being the common gift of God to man, raises the general presumption that every man is in a state of sanity until the contrary be proved; every man, therefore, of full age, has the right to dispose of his property by will unless he can be shown to be insane, non compos mentis, of unsound mind, or wanting what is called a sound disposing mind and memory.

A *sound* mind is one wholly free from delusion, all the intellectual faculties existing in a certain degree of vigor and harmony; the propensities, affections and passions being under the subordination of the judgment and will, the former being the controlling power, with a just perception of the natural connexion or repugnancy of ideas. Weak minds again only differ from strong ones in the extent and power of their faculties; but unless they betray symptoms of a total loss of understanding or of idiocy, or of delusion, they cannot properly be considered unsound. (*Shelford*, 25.) A *perfect* capacity is usually tested by this, that the individual talks and discourses rationally and sensibly, and is fully capable of any rational act requiring thought, judgment and reflection. This is the standard of a perfect capacity; but the question is not how well a man can talk or reason, or how much judgment he can display, or with how great propriety and sense he can act; it is only *has* he mind and reason, *can* he talk rationally and sensibly, or *has* he thought, judgment and reflection. Weakness of mind may exist in many different degrees without making a man intestable. Courts will not measure the extent of people's understandings or capacities; if a man be legally compos mentis, be he wise or unwise, he is the disposer of his own property, and his will stands as the reason for his actions. (*Ibid*, 24.)

Insanity is in many cases a state of mind not easily reducible to any correct definition, and not easily ascertained. It may subsist in various degrees, sometimes slight as partaking rather of disposi-

tion or humor, which will not incapacitate a man from managing his own affairs or making a valid contract. It must be something more than this ; something which affords demonstrative proof of the incapacity of the individual to manage his own concerns and dispose of his own property. Madness, when not raving, is sometimes an invisible quality, but it generally discovers itself; it presents its symptoms; it betrays and accuses itself by the most ordinary actions. The habits, the exterior appearance, the conversation and other actions of a man may furnish proofs of insanity, on account of their extravagant and unreasonable nature. But as it is an habituals tate or disposition, and generally a permanent affection of the mind, its existence must be proved not by one instance of unreasonable conduct, but by repeated acts and multiplied actions, testified to by persons who have been attentive observers of them. (*Ibid* 23.)

An *unsound* mind is marked by delusion ; it mingles ideas of imagination with those of sensation, and mistakes one for the other. It is often accompanied by an apparent insensibility to, or perversion of those feelings which belong to our nature. Insane delusion consists in the belief of facts which no rational person would have believed. It may sometimes exist on one or two particular subjects, though generally it is accompanied by eccentricity, irritability, violence, suspicion, exaggeration, inconsistency, and other marks and symptoms which may lead to confirm the existence of delusion, and to establish its insane character. Instances of delusion on particular subjects, or partial insanity, are recorded, where the judgment and reasoning faculties were not only unimpaired on all other subjects, but where the monomaniac was in other respects remarkably acute and shrewd. (*Ibid* 26.)

These are cases of great difficulty ; it is hard to define the invisible line that divides perfect and partial insanity. Each case must rest on its own circumstances. The rule laid down by Lord Hale as to criminal matters is, that " such a person as laboring under melancholy distempers hath yet ordinarily as great understanding as ordinarily a child of fourteen years hath, is such a person as may be guilty of treason or felony." And this doctrine of partial insanity is applicable to civil cases, if existing at the time of the act done ; and will avail to defeat a will, the direct offspring of such partial insanity. But it has been held that a will cannot be set aside on the ground of monomania, unless there be the most decisive evidence, that at the time of making the will, the belief in the testator's mind amounted to insane delusion. And it was for the jury to say, whether this is a case of monomania ; whether there was any topic or matter upon which the testator's mind was in a state of delusion, which, whenever this

string was touched, produced symptoms and evidence of insanity which could not be mistaken.

Doctor Morris, the testator in this case, is admitted to have been at one time a man of sound mind. He was a man of liberal education and of much respectability in one of the learned professions. He is proved to have possessed the common affections of our nature, to what extent, and towards whom directed, and in what degree, it would be important for the jury to determine. Whether habits of intemperance or other causes impaired or destroyed this mind, perverted or changed, or weakened these natural affections, and in what manner, and to what extent, were also important questions for their determination. He made a will on the 7th November, 1836, and again, for reasons which have been detailed, he executed another will, which is the paper now trying, on the 8th of November, 1836. This is the important period of inquiry as to the state of his mind. Had he then, at the time of executing that paper, a sound disposing mind and memory; could he converse rationally and act with judgment and reflection in reference to the matter he was about; had he, as this court put it to the jury in the case of *Masten* vs. *Anderson*, (a) sufficient mind to know that he was making a will, and to understand what was implied in that act; or on the other hand, was he at that time the victim of insanity, unable to distinguish between things that were real and the vain creatures of his own imagination; or a miserable monomaniac, laboring under a fixed delusion in regard to some subject which no rational mind could entertain, and which had a direct influence or bearing on the will?

The paper itself which was before the jury would afford important aid in determining the question of insanity. Are its dispositions in accordance with, or in opposition to the previously expressed purposes and known affections of the testator. The internal evidence that it affords, with all the circumstances which surrounded it, may be fairly brought to bear on this question; remembering that whilst we are looking into the will itself for evidences of sanity or insanity,

(a) *Masten* vs. *Anderson et al.*   Kent, 1836.

Chief Justice, T. CLAYTON, charged the jury. Every one is presumed to be sane until the contrary be shown. Opinions are entitled to no credit unless they detail the facts. You form your opinion from the facts, and not from the opinions of others. An instrumentary witness may speak of his opinion. A failure of mind or memory to some extent will not set aside a will. If the testator have sufficient mind remaining to understand what he is about and to manage his affairs, his will is good. If he understand that he is making a will, and has mind enough to comprehend what is implied in that act, it is sufficient.

we are not to make a will for the testator ourselves, but to let his will be the reason for his act, unless something appear plainly inconsistent with sanity itself, or with his previously expressed and deeply fixed purposes.

The day after the execution of this paper, Doctor Morris committed suicide, and this introduces another important question as to what operation and weight this fact ought properly to have in determining the question of sanity or insanity at the time of making the will. This also is a question of fact for the jury, to be determined according to their own view of the nature of the act in general, and in reference to the particular case before them. It necessarily draws around it all those circumstances of condition in life, mode of living, habits of thought and action, principles of conduct, and of religious views and feelings, which so essentially connect themselves with the act of suicide, in determining whether it was the work of an insane mind or of judgment and determination. On all of these topics the jury have had abundance of evidence in this cause to aid them in their determination of the question. All the court had to say to them on the subject was, that in our opinion the law draws no inference either of sanity or insanity from the fact of suicide itself alone. In England, where the act of suicide is a violation of the law of the land, and punishable as a crime by forfeiture of the goods of the self murderer, slight evidence is *on this account* held to justify a coroner's jury in finding a verdict of insanity. But it is remarked, in an able work on this subject, from which he had already quoted largely, that "the excuse of insanity ought not to be strained to that length to which it is sometimes carried by the coroners' juries, namely, that the very act of suicide is an evidence of insanity, as if every man who acted contrary to reason had therefore no reason at all. For the same argument would prove every other criminal non compos as well as the self murderer. Lord Chancellor Redesdale expressed an opinion that insanity is not to be inferred from the mere act of suicide. It was not inferred by law, but must be proved. But Lord Eldon admitted that it was fair to consider whether at the time of a contract the party did not intend to commit the act of suicide; and if it were proved that he was at the moment under the influence of that morbid feeling, it might be a circumstance of considerable weight in leading to the inference of insanity."

In this state there is no forfeiture incurred by the act of suicide, nor is it otherwise punished as a crime; there is no occasion, therefore, to infer against the sanity in favor of innocence, nor to warp the act itself beyond its legitimate influence from motives of humanity to the deceased's relatives, and to save the forfeiture of his estate.

The law makes no inference from it.   It stands as a fact, together with all the other acts of the deceased's life, together with his character, situation, habits, thoughts, purposes, principles and affections, so far as these are made known to the jury through the medium of the evidence, from which they are to determine whether the deceased, not merely at the time of committing suicide, but at the time of making his will, was of unsound mind.

The period of making the will, and of giving instructions for the writing it, is the important time to be kept in view by the jury; for neither previous nor subsequent insanity will avoid a will if the testator was of sound mind when he made it.   But it is true, that as *sanity* is always to be presumed until the contrary be shown, so if *insanity* be proved at any time before the making a will, it will be presumed to have continued unless the contrary be shown.   A lunatic may make a will in a lucid interval, but the existence of such lucid interval must be shown.   The proof of a lucid interval is as difficult to produce a degree of certainty as the proof of insanity. If insanity consists in the existence of delusion, the absence of such delusion must produce a lucid interval.   Delusion has been said to be the fancying things to exist which no rational mind could believe to exist; as that trees will walk, or statues nod ; and which fancy no proof or reasoning will remove.   Sir J. Nicholl said, " that no case had ever come under his notice, where insanity had been held to be established, without any delusion ever having prevailed ; nor was he able exactly to understand what is meant by a lucid interval, if it did not take place when no symptom of delusion can be called forth at the time.   If the mind is apparently rational on all subjects, and no symptom of delusion can be called forth on any subject, the disorder is for that time absent; there is then a lucid interval, in the course of which the lunatic may make a valid will.   The proof of a lucid interval depends also much on the nature of the previous insanity.   If that were mere delirium and not fixed derangement, slighter evidence would be satisfactory as to the lucid interval.   In cases of proper insanity the proof of a lucid interval is very difficult, because the patient often appears rational when the malady has in truth not abated.   But delirium is a fluctuating state of mind, and when it is off the rational state usually supervenes, and does actually exist.

The probable cause of insanity often affords valuable aid in determining its character.   Drunknnness itself is a species of insanity, and might invalidate a will made during the drunken fit; but long continued habits of intemperance may gradually impair the mind and destroy the memory and other faculties, so as to produce insanity of

another kind. This is an important subject of inquiry in the present case. If Doctor Morris was insane to such an extent as that he could not make a valid will, habitual intemperance was at least one of the causes of such insanity. The form of insanity usually produced by intemperance is mania a potu, or delirium tremens; which is a raging and decided insanity that cannot be mistaken, temporary in its duration, and when off is followed not merely by a lucid interval, but by permanent restoration to reason. Yet it is not improbable, that drunkenness long continued, or much indulged in, may produce on some minds, and with some temperaments, permanent derangement, fixed insanity. It has not been contended that Doctor Morris was the subject of mania a potu; but the attempt has been to show, that from intemperance and other causes, a permanent state of deranged intellect, a morbid delusion came upon him, which resulted in the taking his own life. This was the great question for the jury to try, whether Doctor Morris was the subject of such insane delusions, fancying things which did not exist and could not exist, and which no reasonable mind could believe to exist; did this delusion continue up to the time of making his will, without intermission at that time, and to such an extent as to exclude thought, judgment and reflection; *to deprive him* of the power of rational conversation on the matter he was about; and of that kind of knowledge that would enable him to apprehend in his own mind that he was making a will, and the objects and purposes of such an act. If he had this knowledge, memory and judgment, it is what the law means by a sound disposing mind and memory, which is sufficient to make the will valid, whatever may have been the state of the testator's mind before or after.

On the other question, whether this will is vitiated by the undue influence exercised over the testator by the respondent or others, the *court* charged the law to be, that importunity will not vitiate a will unless it be extended to such a degree as to take away the free agency of the testator; such as he is too weak to resist. 3 *Stark.* 1707. The influence must amount to force and coercion, destroying free agency, (*Shelford,* 329;) it must not be the influence of affection and attachment, nor the mere desire of gratifying the wishes of another, for that would be very strong ground in support of a will: further, there must be proof that the will was obtained by such coercion, and made merely because the testator could not resist the importunities to make it. It is also true, as a principle of law, as it is in accordance with reason, that if the will be written by a person who is benefitted by it, or by a person standing in the relation of counsel or attorney, and who is also benefitted by it, these are circumstances to excite a stricter scrutiny and require stricter proof

of volition and capacity. The increased strictness of proof arising from the fact that the will was drawn or written by a person who is the counsel or attorney of the party, and who is benefitted by the will, where such facts exist, is just such as will satisfy the jury that the testator was not imposed on, but that he knew that the will was in favor of the person who drafted it. Such proof is supplied by evidence of instructions given to the writer, that the testator read over the will, being of sufficient capacity to understand what he was reading, or by other evidence showing that he knew the will was in favor of the writer. (*Shelford*, 325, 6.)

The court also told the jury, that they should weigh the testimony in a case of this kind, not merely on the character of the witnesses for veracity and integrity, but also with reference to their intelligence and powers of observation. And there is this distinction between the subscribing witnesses to the will and other witnesses. The law places witnesses around the testator at the time of making his will for the very purpose, among other things, to ascertain and judge of his capacity; they may, therefore, testify as to the *opinion* they formed of the testator's mind at the time of executing the will. Other witnesses may testify to the appearance of the testator, and to particular facts, from which the state of his mind may be inferred; but not as to their opinion or judgment merely of his sanity or insanity, without stating the facts from which they draw their conclusions. The testimony of medical men stands upon the same ground, except that being more competent to form an opinion upon subjects of this kind, greater weight will, in general, be given to such opinions.

The jury returned a verdict establishing the will.

*Booth, Rogers,* and *W. H. Rogers,* for caveator.
*J. A. Bayard,* for defendant.